IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CESAR TORRES

Plaintiff,

vs.

CHICAGO POLICE SERGEANT DAVID HICKEY STAR NO. 11240
CHICAGO POLICE DETECTIVE JAMES DECICCO STAR NO. 21006

and

CITY OF CHICAGO,

Defendants

JURY TRIAL DEMANDED

## COMPLAINT

NOW COMES the Plaintiff, CESAR TORRES, by and through his attorneys Stephen L. Richards and Joshua S.M. Richards and makes the following complaint against CHICAGO SERGEANT DAVID HICKEY STAR NO. 11240, CHICAGO POLICE DETECTIVE JAMES DECICCO STAR NO. 21006 and the CITY OF CHICAGO.

In support thereof, CESAR TORRES states as follows:

## JURISDICTION

1. This action is brought pursuant to 42 U.S.C. Sec. 1983 to redress the deprivation of law of Cesar Torres's civil rights as secured by the United States Constitution.

2. This court has jurisdiction of the action pursuant to 28 U.S.C. Secs. 1331, 1343, 1367.

## VENUE

3. Venue is proper under 28 U.S.C. Sec. 1391(b).

## PARTIES

4. Plaintiff Cesar Torres is a male person who is a United States citizen and a resident of Cook County, Illinois.

5. Chicago Police Sergeant David Hickey Star No. 11240 was at all times relevant to this suit a sergeant in the Chicago Police Department. He is sued in his individual capacity.

6. Chicago Police Detective Chicago Police Detective James Decicco Star No. 21006 was at all times relevant to this suit a detective in the Chicago Police Department. He is sued in his individual capacity.

7. Defendant City of Chicago is a Municipal Corporation, organized pursuant to the laws of the State of Illinois.

`
## FACTUAL ALLEGATIONS

*Procedural History*

8. On August 15, 2018, defendant Cesar Torres was convicted by a jury of first degree murder and attempt first degree murder.

9. He was sentenced to 71 years in prison.

10. On September 27, 2021, the appellate court reversed his conviction and remanded the case for a new trial. *People v. Torres*, 2021 IL App (1st) 182125.

11. On February 24, 2023, he was acquitted in a bench trial conducted before Judge Alfredo Maldonado.

12. On October 25, 2025, Cesar Torres was granted a certificate of innocence,

*The Murder of Ricardo Herrera*

13. Eric Meneses was the brother of the girl Ricardo Herrera was dating.

14. Meneses had planned to pick up Herrera from Dennis Chavez's house on the night of June 15, 2013. Meneses texted Herrera to tell him that he would pick him after it stopped raining.

15. Chavez later told Meneses that Herrera grew impatient and decided to walk to 26th and Ridgeway where Meneses was visiting a friend. As Meneses sat in his car, he heard gunshots coming from 25th and Ridgeway. Meneses called Herrera, but he did not answer his phone. Meneses went to Ridgeway and told the police that the decedent was Herrera.

16. Dennis Chavez had a prior conviction for possession of a stolen motor vehicle.

17. Chavez had planned to host a "boy's night of drinking" at his house on June 12, 2013.

18. Earlier that day, Chavez went with Herrera to sell his car and then the group returned to Hererra's house. About an hour and a half later, Herrera and Chavez walked to Moreno Liquors.

19. Before Herrera and Chavez reached the store, Chavez realized that he did not have any money. They went to Chavez's house to get the money and waited until the rain cleared to return to the store.

20. As they walked back to the store, they ran into their friend, Nick Mundo who joined them. They walked three across; Herrera next to the parkway, Mundo in the middle, and Chavez on the left.

21. Chavez saw a man wearing a red T-shirt and black shorts pacing back and forth near the corner of the liquor store. The man began to walk in their direction.

22. The man approached Herrera and said, "What's up." Herrera replied, "What's up."

23. The man then started shooting at Herrera, Chavez, and Mundo.

24. Chavez heard more than 10 gunshots fired. He maintained that he could see the man's face because the man was standing about three or four feet away and the sidewalk was well illuminated by the streetlights.

25. Because Chavez had his head down as the gunshots were fired, he did not realize that the man was shooting at them until he saw Mundo running northbound.

26. Chavez ran after Mundo, but stopped when he did not see Herrera running behind him. He looked back and saw Herrera on the ground and the man walking back to the street corner. Herrera told Chavez that he had been hit. The man turned and fired the gun as Chavez ran towards Herrera.

27. Chavez moved to the side of a car from where he saw the man walk up to Herrera, get on his knees, and shoot Herrera in the head. As Chavez ran home, he realized that he had been shot because his shoulder felt hot.

28. Nick Mundo testified substantially the same as Chavez as to the events leading up to the shooting. Mundo further stated that he had not paid attention to the shooter because he was talking to his friends and it had been raining on and off.

29. Mundo noted that the exchange between the man and Herrera and the shooting occurred within seconds. He claimed that he stood "pretty face-to-face" or at least a few feet away from the man during the shooting. Mundo also stated that he saw the man reach for a gun before the gunshots were fired.

30. At trial, Mundo acknowledged that he made a videotaped statement in which he said that the shooter reached across his body and pulled out the gun with his right hand. On further examination, he denied saying that the shooter was right-handed, but asserted that the man had the gun in his left pocket.

31. After further questioning, Mundo acknowledged that he could not recall if he said in his videotaped statement that the man held the gun in his right hand or if the man was right· handed. On recross-examination, Mundo asserted that the man had the gun in his left pocket and reached for the gun with his both hands.

32. Mundo was frightened and surprised when he saw the man pull out the gun and fire it. He ran as soon as the gun came out. As he ran, he noticed that his shirt was covered in blood and that he had been shot in the left shoulder area.

33. Chavez and Mundo were treated for their injuries at Mount Sinai Hospital. Chavez received additional medical treatment for a broken collar bone and had to wear a sling for several months.

34. Two other persons, Manuel Sanchez and Gerardo Trejo witnessed the shooting.

35. Sanchez and Trejo lived on the block where the shooting occurred on June 15, 2013.

36. At around 10:45 p.m., Sanchez woke up to the sound of a gunshot. He looked out the window and saw a man wearing a red T-shirt and blue shorts standing across the street with a gun and another person lying on the ground. He saw the armed man get in front of the unarmed man and stretch his arm down while holding an object in his hand. Sanchez was unsure if the object was a gun because it was dark. Sanchez later saw the armed man walking towards 26th Street.

37. Trejo heard five or six gunshots around 10:45 p.m. He looked out the window and saw a man, who was wearing a red T-shirt and jean shorts, with a gun. The armed man fired the gun two times at another man who fell to the ground. The armed man then crossed the street and headed south.

38. Neither Sanchez nor Trejo ever identified the shooter.

39. Herrera's autopsy showed that he suffered 12 gunshot wounds. Six deformed copper jacketed, medium caliber lead bullets were recovered from Herrera's neck, right clavicle, right shoulder,

right hip, left chest cavity, and sacrum. Herrera's cause of death was multiple gunshot wounds and the manner of death was a homicide.

*The Police Investigation*

40. While at the hospital, Chavez and Mundo provided a description of the shooter to Detective David March.

41. At trial, there was evidence that Mundo described the shooter as a "white complected, Hispanic, red shirt, black shorts, black shoes, and short." Chavez described the shooter as being 5'4" tall with pushed back or slicked back hair and wearing black shorts, a red T-shirt, and black shoes.

42. There was also evidence that Chavez described the offender as a Hispanic man "in his early 20's, approximately 5'6" to 5'8" in height, medium build, medium complexion, black hair, medium length, and wearing a red T-shirt, black or red shorts, and black shoes."

43. There was also evidence that Mundo described the offender as a Hispanic man "in his early 20's, approximately 5'6" to 5'8" tall, medium build, medium complexion, black hair, medium length and wearing a red t·shirt and black shoes." Mundo also stated that the offender had a mustache and a goatee.

44. According to defendant Decicco, Chavez and Mundo described the offender as a Hispanic man, 5'6" to 5'8" tall, with medium length black hair, and wearing a red shirt and black or red shorts.

45. On the day after the shooting, defendant Decicco sent detectives to obtain surveillance videos from Moreno Liquor Store.

46. On June 23, 2013, Chavez identified the offender as the man shown in the photo stills from the the surveillance video.

47. On July 2, 2013, defendant David Hickey viewed the surveillance video. After viewing the video, Hickey claimed, falsely, that the man in the video was Cesar Torres, who he said was nicknamed "Baby Ghost," and whom he had encountered when he worked in the gang investigation unit.

48. Defendant Hickey conveyed this false information to the prosecutors who investigated and tried Cesar Torres's case.

49. Hickey printed out a photo of Torres that had been taken in 2010 and gave it to the defendant Decicco. Decicco also printed a photo of Torres that had been taken in 2012.

50. After viewing the photographs, Defendant Decicco determined that the man in the video was not Cesar Torres.

51. Defendant Decicco claimed, falsely, that he received an anonymous tip on February 7, 2014. He claimed that the anonymous tipster was a woman who said that he "might want to look at a person named Ghost." Decicco also claimed that the woman said that Ghost's first name was Cesar and that he lived in the area of 30th and Kenneth.

52. Decicco did not record the call, document it in any report, and does not know when the call was allegedly made. He entered the tipster's information in the database and retrieved a photo of Torres that had been taken on July 3, 2013. He assembled a photo array with Torres' photo.

53. Decicco failed to record the alleged tip or document when the tip was received, the caller's name, or telephone number.

54. Decicco conveyed this false information to the prosecutors who investigated and tried Cesar Torres's case.

55. Sometime between February 7, 2014 and February 10, 2014, Decicco compiled a photo array using a more recent photograph of Cesar Torres, taken on July 3, 2013.

56. In the photo-array, Cesar Torres was the only one in a red shirt.

57. Shortly after compiling the photo-array, Decicco called Chavez and Mundo and told them that the "Two-Sixer" who had committed the shooting was in custody and that his name was "Baby Ghost."

58. On February 10, 2014, Decicco showed the photograph to Chavez and Mundo.

59. Chavez identified Cesar Torres in the photo array.

60. Mundo did not identify Cesar Torres in the photo array.

61. On February 11, 2014, Chavez made a post related to the murder investigation on his Face book profile under the user name "Damien Crook." The post read: "Detectives came looking for me. We may finally have justice for my homie Ricky [Herrera]." Chavez made an additional Face book comment in which he stated that he heard that they caught that "Two-Shit."

62. Defendant Decicco assembled a lineup for viewing by Chavez and Mundo.

63. On February 16, 2014, Decicco arrested Cesar Torres.

64. There was no probable cause for Cesar Torres's arrest.

65. The only person who was in both the photo-array and the lineup was Cesar Torres.

66. The only person in the lineup who matched the description of the shooter as a medium-complected Hispanic man in his early 20s, with medium length hair, was Cesar Torres.

67. On February 16, 2014, Decicco conducted a five-person lineup that consisted of Torres and four fillers. Torres and the four fillers wore either black or gray shirts. Torres elected to sit in slot number two.

68. Decicco and his partner were in the observation room when Chavez and Mundo viewed the lineup separately on the same day and around the same time.

69. Torres and two other fillers were the only ones in the lineup who were in their early 20s. The two fillers who appeared to be in their early 20s also had long ponytails and sat on either side of Torres.

70. The two fillers who had long ponytails "almost down to their bottoms," and they looked like twin brothers.

71. The remaining two fillers, who were sitting on the far right, had shorter hair, but were 28 years old and 32 years old.

72. These fillers appeared to be much older than Cesar Torres, who was 22 years old.

73. Torres was the only one in the lineup who was in his early 20s with short or medium hair.

*The First Trial*

74. Chavez and Mundo both testified to the circumstances of Ricardo Herrera's murder.

75. In open court, Chavez and Mundo both identified Cesar Torres as the shooter.

76. In court, Mundo described the shooter as a ""white complected" Hispanic with a fade haircut, in his early 20s, short, and wearing a red shirt, black shorts, and black shoes,

77. In court, Chavez described the shooter as around 5'4", with slicked-back hair, a red shirt, black shorts, and black shoes, but could not recall if he told detectives anything about the shooter's ethnicity or age.

78. It was stipulated that when Chavez and Mundo spoke with detective David March in the hospital, they both described the shooter as a male Hispanic in his early 20s, 5'6" to 5'8" tall, with a medium build, medium complexion, and medium-length black hair, wearing a red t-shirt and black shoes; Mundo added that the shooter had a mustache and goatee.

79. Manuel Sanchez and Gerardo Sanchez both testified to the circumstances of the murder but did not identify Cesar Torres as the shooter. Both of them were unable to identify the shooter when shown a photo-array.

80. There was a stipulation that Ricardo Herrera died from multiple gunshot wounds, including a gunshot wound involving the brain, although none of the wounds showed evidence of close-range firing.

81. Surveillance camera footage from Moreno's Liquors showed a Hispanic individual in a red shirt and black shorts outside the store around 11 p.m.

82. Defendants Decicco and Hickey both testified that on July 2, 2013, Decicco showed the surveillance video to Hickey.

83. Hickey and Decicco both testified that Hickey recognized the person in the video as a "gang subject," who went by the street name of "Baby Ghost," and who was, in fact, Cesar Torres.

84. Although Hickey showed Decicco two photographs of Cesar Torres for comparison, Decicco made no attempt to arrest Cesar Torres.

85. Defendant James Decicco testified to the circumstances of the investigation, as detailed above.

86. On June 23, 2013, Decicco showed one of the photo stills from the surveillance video to Chavez. Chavez identified the man in the red shirt and black shorts as the shooter.

87. Decicco testified to having received the anonymous tip, as detailed above, on February 7, 2014.

88. Decicco testified to the circumstances of the identifications at the photo arrays and the lineups, as detailed above.

89. Decicco acknowledged that the photo still did not show the offender's detailed features such as his eye color or facial scars,

90. Cesar Torres presented the testimony of Jesus Salazar, the program manager for the violence prevention program of Enlace Chicago, to testify about Cesar Torres's participation in the program during the year preceding the shooting.

91. According to Salazar, on June 17 and 18, 2013, Cesar Torres attended a workshop for participants who showed "a decrease in street activity" and were ready for employment. Salazar testified that Cesar Torres always had his hair in a bald fade or a crewcut, never longer.

92. Cesar Torres also called Dr. Deryn Strange, a cognitive psychologist who gave expert testimony in eyewitness recall and problems associated with it.

93. Deryn Strange testified that a witness's perception can be impaired by many factors, such as poor lighting, inattention (e.g., being preoccupied by conversation, or paying attention to an assailant's weapon instead of his face), and alcohol consumption.

94. According to Dr. Strange, Mundo's emergency room records indicated alcohol consumption, and there is a "precipitous drop-off" in the information that one remembers as time passes.

95. Dr. Strange testified that memory can be "pretty accurate" for "global features" such as an assailant's approximate height and shirt color, but is less accurate for "fine-grain details" such as facial characteristics. In addition, numerous studies have shown no correlation between witness confidence and accuracy.

96. Regarding the lineup, Dr. Strange testified that" [e]verybody should look sufficiently similar to the description given by the witness so that the identification procedure is a true test of memory." Lineups should not contain "biasing features" to make the suspect stand out, such as "clothing bias," which would be present in a lineup in which only the suspect is wearing clothing of a type that had been previously shown to the witness.

97. In opening closing argument, prosecutor Liam Reardon recounted Defendant Hickey's testimony that he had identified "Baby Ghost" or Cesar Torres in the surveillance video.

98. In opening closing argument, prosecutor Liam Reardon also recounted Defendant Decicco's testimony about the anonymous telephone call.

99. In rebuttal closing argument, prosecutor David Kelly also argued that David Hickey ahad recognized "Baby Ghost" when he viewed the surveillance video.

100. Prosecutor Kelly also recounted Decicco's testimony about the anonymous tip.

101. The jury found Cesar Torres guilty of first-degree murder of Herrera, attempted murder of Chavez and Mundo, and of personally discharging a firearm during the offenses. Cesar Torres was sentenced to an aggregate term of 71 years in prison.

*The Direct Appeal*

102. On direct appeal, Cesar Torres's conviction was reversed based on the erroneous admission of Defendant Decicco's testimony as to the alleged "anonymous tip." The case was remanded for a new trial.

*The Second Trial*

103. On remand, Cesar Torres waived jury and took a bench trial.

104. The prosecution presented essentially the same evidence as at the first trial.

105. The defense also presented the same evidence, with one major exception.

106. Jesus Salazar identified Torres in Defense Exhibits 4, 5, 6, 7, and 8 as photographs taken of Torres at the Men's Wearhouse Events.

107. One of the photographs, Defense Exhibit No. 4, showed the back of Torres's head, reflected in a mirror.

108. Torres had a growth on the back of his head, visible in Defense Exhibit No. 4, which Salazar described as a large "keloid." The keloid was visible in Defense Exhibit No. 4.

109. Throughout the period Salazar knew Torres, Torres wore his hair in a short bald fade. The keloid was always visible.

110. In court, Torres parted his ponytail, and Salazar identified a keloid, visible on the back of Torres's head as the same keloid which Torres had in 2013.

111. Salazar testified that Torres was left-handed.

112. On February 24, 2023, the trial court acquitted Cesar Torres.

## CLAIMS

### COUNT I -- VIOLATION OF DUE PROCESS BY DEFENDANT DAVID HICKEY BY FABRICATING EVIDENCE THAT HE COULD IDENTIFY THE PERSON IN THE SURVEILLANCE VIDEO AS "BABY GHOST," OR CESAR TORRES

113. Cesar Torres realleges all previous paragraphs and incorporates them by reference.

114. Defendant David Hickey fabricated evidence that the man depicted in the surveillance video was Cesar Torres, whom he allegedly knew as "Baby Ghost."

115. Defendant Hickey memorialized this information in police reports and conveyed this false information to Defendant DiCicco.

116. Defendant Hickey also conveyed this false information to the prosecutors who investigated and prosecuted Cesar Torres.

117. This false information was conveyed to the jury not only through the testimony of Defendant Hickey, but also through the testimony of Defendant DiCicco, for which defendant Hickey cannot claim immunity.

118. This false information was a material factor in Cesar Torres's conviction.

119. The false information violated Cesar Torres's right to due process under the fourteenth amendment to the United States Constitution.

### COUNT II -- VIOLATION OF DUE PROCESS BY DEFENDANT JAMES DECICCO BY FABRICATING EVIDENCE THAT HE RECEIVED AN ANONYMOUS TIP THAT CESAR TORRES OR "BABY GHOST," WAS THE SHOOTER

120. Cesar Torres realleges all previous paragraphs and incorporates them by reference.

121. Defendant James Decicco fabricated evidence that he received an anonymous tip that Cesar Torres or "Baby Ghost" was the shooter.

122. Defendant Decicco conveyed this false information to the prosecutors and it contributed to the decision to charge Cesar Torres and played a role in his conviction.

123. This false information was a material factor in Cesar Torres's conviction.

124. The false information violated Cesar Torres's right to due process under the fourteenth amendment to the United States Constitution.

### COUNT III – VIOLATION OF FOURTEENTH AMENDMENT DUE PROCESS BY DEFENDANT DECICCO BY USING COERCIVE AND SUGGESTIVE IDENTIFICATION PROCEDURES TO INDUCE THE WITNESSES CHAVEZ AND MUNDO TO IDENTIFY CESAR TORRES

125. Cesar Torres realleges all previous paragraphs and incorporates them by reference.

126. Defendant Decicco deprived Cesar Torres of due process by: (1) telling the witnesses Chavez and Mundo that the offender, "Baby Ghost," a "Two-Sixer" was in custody, (2) constructing a photo array in which the only person in the photo array wearing a red shirt was Cesar Torres, and (3) constructing a lineup in which Cesar Torres was the only young male Hispanic with short hair and in which the other fillers were either obviously older or had hair in waist length ponytails.

127. These suggestive procedures deprived Cesar Torres of a fair trial.

**COUNT IV: INDEMNIFICATION**

**DEFENDANT CITY OF CHICAGO**

180. Cesar Torres realleges all previous paragraphs and incorporated them by reference.

181. Illinois law provides that public entities, such as defendant City of Chicago are directed to pay any compensatory damages on a tort judgment against an employee who was acting within the scope of his or her employment.

182. At all relevant time, defendants were agents of defendant City of Chicago and of the Chicago Police Department acting within the scope of their employment. Defendant City of Chicago, therefore, is liable as principal for all torts committed by its agents, defendants Hickey and Decicco. .

### PRAYER FOR RELIEF

WHEREFORE, Cesar Torres requests this honorable court grant Cesar Torres judgment against all defendants in a fair and just amount. Specifically Cesar Torres prays for both compensatory and punitive damages against all defendants in addition to costs and reasonable attorney's fees and all other relief as this court finds just and reasonable.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), plaintiff Cesar Torres demands trial by jury for all the issues pleaded.

                                                          Plaintiff Cesar Torres

                                                          /s/ Stephen L. Richards

By: Stephen L. Richards
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927
Sricha5461@aol.com         Attorney No: 6191946